UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Frank Coniglio, Jr., et al., | ) | CASE NO.: 5:12CV1773 |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN ADAMS |
| | ) | |
| | ) | |
| | ) | |
| CBC Services, Inc., et al., | ) | |
| | ) | **ORDER** |
| | ) | |
| Defendants. | ) | (Resolves Docs. 35, 42, 71, 73, 77, 80, 91, |
| | ) | and 95) |
| | ) | |

Pending before the Court are the following motions:  1) Plaintiffs' motion to dismiss Defendants' counterclaims (Doc. 35); 2) Defendants' motion for attorneys' fees and costs (Doc. 42); 3) Plaintiffs' motion for partial summary judgment (Doc. 71); 4) Defendants' motion for partial summary judgment (Doc. 73); 5) Defendants' motion to strike certain expert opinions (Doc. 77); 6) Plaintiffs' motion for leave to supplement their response to the motion for attorney fees (Doc. 80); 7) Plaintiffs' motion for supplement the record in support of its motion for summary judgment (Doc. 91); and 8) Defendants' motion for leave to file a sur-reply on Plaintiffs' final motion (Doc. 95).   The Court now resolves these motions.

Initially, Plaintiffs' motion for leave to supplement their response to the motion for attorney fees (Doc. 80) is GRANTED.   The Court will consider the additional response. Furthermore, Defendants' motion for leave to file a sur-reply (Doc. 95) is GRANTED, and Plaintiffs' motion to supplement (Doc. 91) the record in support of its motion for summary judgment is GRANTED.   The Court will consider the sur-reply and the supplement.

The Court will next endeavor to resolve the parties' competing motions for summary judgment.

## I.       Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed.R. Civ.P. 56(a).   The initial burden of showing the absence of any "genuine issues" belongs to the moving party.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed.R. Civ.P. 56(c)).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*.   (quoting former Fed.R. Civ.P. 56(c)).   A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens.   *Id*. at 252.   Moreover, the Court must view a summary judgment motion "in the light most favorable to the party opposing the motion."   *U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury."   *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995).   Moreover, Fed.R. Civ.P. 56(e) states as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

…

(2) consider the fact undisputed for purposes of the motion; [or]

(3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]

Accordingly, summary judgment analysis asks whether a trial is necessary and therefore is appropriate when there are no genuine issues of fact.   *Anderson,* 477 U.S. at 250.

   **1.   Counts One, Two, Three, and Five of the Complaint**

   Plaintiffs Frank and Joseph Coniglio and Defendants CBC Services, Inc., Chesapeake Exploration LLC, and CHK Utica, LLC (collectively "Chesapeake") have both sought summary judgment on the first count in Plaintiffs' complaint.   In Count One, Plaintiffs seek a declaratory judgment determining the rights of the parties under several written agreements.   Both parties contend that summary judgment is appropriate on this count of the complaint.

   "The role of courts in examining contracts is to ascertain the intent of the parties." *Savedoff v. Access Group, Inc.,* 524 F.3d 754, 763 (6th Cir. 2008), (citing *City of St. Marys v. Auglaize Cty. Bd. of Commrs.,* 875 N.E.2d 561, 566 (Ohio 2007)). Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 652 N.E.2d 684, 686 (Ohio 1995).    In this specific subject matter area, Ohio courts have noted as follows:

> "The rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument [.]" *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129 (1897). "Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." *Id.* The construction of written contracts and instruments of conveyance is a matter of law that this court reviews de novo. *Bath Twp. v. Raymond C. Firestone Co.*, 140 Ohio App.3d 252, 256 (2000).

*Kramer v. PAC Drilling Oil & Gas, LLC*, 197 Ohio App.3d 554, 558 (2011).   Ohio courts have

further explained contract interpretation:

> Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. *Shifrin v. Forest City Enterprises*, 64 Ohio St.3d 635, 638. The court must read words and phrases in context and apply the rules of grammar and common usage. *Keller v. Foster Wheel Energy Corp.*, 163 Ohio App.3d 325. The rules of grammar require "dependent clauses [to] modify some part of the main clause." *Id.*, citing *Bryan Chamber of Commerce v. Bd. of Tax Appeals* (1966), 5 Ohio App.2d 195. *See, also, Carter v. Youngstown* (1946), 146 Ohio St. 203, 209 ("referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.")... Moreover, contracts must be interpreted in a way that renders all provisions meaningful and not mere surplusage. *Sherwin-Williams Co. v. Travelers Casualty & Surety Co.*, Cuyahoga App. No. 82867, 2003-Ohio-6039.

> With regard to the law pertaining to rights of first refusal, we note that a right of first refusal constitutes a promise to present offers made by third parties to the promisee in order to afford the promisee the opportunity to match the offer. *Latina v. Woodpath Development Co.* (1991), 57 Ohio St.3d 212.

*Lo-Med Prescription Servs., Inc. v. Eliza Jennings Group*, 2007 WL 1290078, at *3-4 (Ohio Ct. App. May 3, 2007).

Plaintiffs are siblings that entered into numerous oil and gas leases with Anschutz Exploration Company in late 2008.   The precise lease ("the Lease") at issue herein was signed by Plaintiffs on December 10, 2008.   Anschutz subsequently assigned the Lease to Chesapeake Exploration, which in turn assigned portions of the Lease to CHK Utica and Cardinal Gas Services.   This original lease also contained a 16-paragraph addendum to include specific provisions requested by Plaintiffs.   Of particular import in this dispute is Paragraph 14 of the lease addendum which reads as follows:

> Notwithstanding anything to the contrary contain in the Lease, no rights to use the surface of the Leasehold to drill, maintain or operate wells, construct roads and/or install pipelines and related facilities are granted to Lessee.   The above exclusion of the rights to use the surface shall not be construed as waiving, releasing or relinquishing the right of Lessee to conduct seismic surveys, or the right of Lessee in and to the oil and gas in and under the Leasehold, or that may be produced from the Leasehold, or the right of Lessee to explore for, develop or produce such oil and

> gas by directional drilling or other method from adjacent lands with wells bottomed beneath the Leasehold, or by pooling or utilizing with other lands for the purpose of producing and enjoying such oil and gas.

Doc. 29-1 at 7.  Plaintiffs contend that the above provision makes clear that the Lease was a non-drilling lease that provided Chesapeake no right to use the surface of the property.

Even if the Court were to adopt Plaintiffs' interpretation that Paragraph 14 of the addendum serves to nullify nearly the entirety of the remaining paragraphs in the addendum, such an interpretation will not result in Plaintiffs' desired result.   Instead, the Court must also examine the parties' later-entered-into agreement, the Surface Use Agreement ("SUA").  As its name suggests, the SUA was entered into because Chesapeake "desire[d] to enter upon the Lands to build a drilling pad for the drilling of, completion, production, operation and maintenance of oil and gas wells thereon, upon a location agreed to by Surface Owner and Surface Owner is agreeable to same."   Doc. 29-3 at 2.    The agreement provides further as follows:

> **Mutual Consent**:  Surface Owner and Operator mutually agree to the location of the well-pad, access road and related facilities as identified on plan attached hereto as "Exhibit A" and made part hereof.
>
> **Topsoils**:  Operator will utilize a "double ditch" method for any excavations occurring on the Lands[.]
>
> …
>
> The foregoing sets out the entire agreement between Surface Owner and Operator as to the matters specifically addressed herein, and supersedes any prior oral or written agreements or negotiations as to these matters not set out in writing herein. Provided however, this Agreement shall not be construed to amend, limit, impair, restrict, or otherwise affect any rights to the Lands or to utilize any portion of the Lands held by Operator under any existing agreement, including any deeds, easements, or oil and gas leases, or at common law.

Doc. 29-3 at 2-3.

The *plain* language of the SUA provides Chesapeake with surface rights to the property at issue.  In an effort to avoid this result, Plaintiffs raise numerous arguments in which the Court

finds no merit.

First, Plaintiffs contend that Chesapeake lacks standing to even pursue relief under the Lease and SUA because it has assigned away *any* rights under those documents to Cardinal Gas Services, a non-party to this action.  In so making this argument, Plaintiffs ignore that the assignment repeatedly uses the term "partial assignment" throughout its language, even containing the title "Partial Assignment and Assumption of Lease Agreement."   Doc. 80-1 at 2.   It continues as follows:

> Assignors have *partially assigned*, transferred, and conveyed, and by these presents do *partially assign*, transfer, and convey unto Cardinal Gas Services, L.L.C. ("Assignee"), part of Assignor's right, title, and interest under the following described oil, gas and mineral lease (the "Lease"):
>
> …
>
> The rights under the Lease *partially assigned* to Assignee are limited to the right to construct, operate and maintain a pipeline with appurtenant facilities, including data acquisition, compression and collection facilities and rights of ingress and egress to the leased premises and all other necessary rights and purposes incident to construction, operation and maintenance of the pipeline, including the right to enforce any covenants and warranties that Assignors are entitled to enforce under the Lease with respect to the pipeline., The rights *partially assigned* are further limited to the gas gathering system listed on Exhibit "A" as it pertains to the wells or lines described on Exhibit "B." No rights are conferred upon Assignee hereunder greater than those held by Assignors as the Lessee under the Lease.

Doc. 80-1 at 2-3.   While the Court readily acknowledges that the assignment grants some right to Cardinal Gas to engage in activities related to the pipeline and other surface activities, the plain language makes clear that the assignment is only a partial assignment, thereby preserving Chesapeake's rights to litigate issues surrounding the Lease and its interpretation.

Next, Plaintiffs contend that the SUA does not provide Chesapeake with a right to install a pipeline because the term pipeline is never expressly used therein.   Chesapeake counters that the term "related facilities" must be read in context to allow for construction of a pipeline.   In reply,

Plaintiffs point to the original Lease to assert that "related facilities" cannot include a pipeline. The Court first addresses this final contention.

As detailed above, the Lease addendum contains the following:  "no rights to use the surface of the Leasehold to drill, maintain or operate wells, construct roads and/or **install pipelines and related facilities** are granted to Lessee." (Emphasis added).  Plaintiffs contend that this separation of related facilities and pipelines makes it clear that the parties never intended for related facilities to include pipelines.  This reading, however, is not supported by any canon of construction or any law the Court reviewed.  The parties never defined the term "related facilities" in any document.  Moreover, such a constrained reading of the SUA would lead to an absurd result – Chesapeake would have negotiated to spend hundreds of thousands of dollars on constructing a well pad, access road, and other "related facilities" with **no ability** to remove oil and gas from the property.  In essence, Chesapeake would then be at a substantial disadvantage, having invested huge sums of money and then being required to go back and renegotiate for the ability to retrieve oil and gas.   The Court declines to interpret the SUA in a manner that would run counter to its plain language and lead to such an absurd interpretation.

Plaintiffs further argue that Paragraph 14 of the addendum somehow overrides the language of the SUA.  In so doing, Plaintiffs effectively argue that the "notwithstanding" language acts as an absolute bar to any *subsequent* amendment.  Plaintiffs assert that the Court must read all of the documents *in pari materia* and therefore must conclude that they intended to *never* allow surface rights on this parcel.  However, Plaintiffs once again ignore the plain language of the SUA which was drafted for the express purpose of providing surface rights.  To suggest that the SUA is nullified by the three-years-earlier-signed lease addendum borders on frivolous and has no legal support.  For that matter, under Plaintiffs' proposed interpretation, the

SUA would have no legal effect in any capacity.

Moreover, Plaintiffs suggestion that the SUA was entered into to compensate them for prior damage to their land lacks any support in the actual written document signed by the parties. Nothing in the document even hints that this is the purpose of the document.   Furthermore, as the matter was reviewed and recommended by an attorney that Plaintiffs now seek to rely on as an expert, it is beyond the pale to suggest that the SUA was drafted to remedy prior property damage when its plain language authorizes surface activities and makes no mention of such damage.

The Court rejects any notion that the SUA failed to modify or amend the prior Lease and addendum.   Once again, if the Court were to adopt this proffered interpretation, then the Court would be left to conclude that Chesapeake paid consideration to Plaintiffs for the SUA and received *nothing* in return.   Moreover, it is entirely unclear why the parties would have attached a map of the property at issue which marked the proposed well pad and access road if Chesapeake was specifically prohibited from constructing these items.   Additionally, it is entirely unclear why Plaintiffs would sign a document that acknowledges that they agree to the precise placements of these items on their land if they believed that Chesapeake had *no surface rights* at all. [1] Accordingly, this argument is also rejected.

Finally, the Court rejects Plaintiffs' contentions that the SUA must not grant these rights because Chesapeake itself sought an additional document, a further lease amendment, which would have eliminated Paragraph 14 of the addendum.   However, the Court has determined that the SUA and its impact are unambiguous.   Accordingly, parol evidence could not be introduced. However, more importantly, this evidence does nothing to alter the Court's analysis.   The additional document sought by Chesapeake would have allowed Chesapeake full, unrestricted

---

[1] For that matter, Plaintiffs have never proffered what *any* of the language in the SUA would mean if it in fact granted no surface rights of any kind.

surface rights – rights far broader than those permitted under the SUA.   The fact that Chesapeake sought these broader rights does not in any manner suggest the SUA did not create the more limited class of rights detailed by its specific language.

Despite the numerous arguments to the contrary by Plaintiffs, the surface rights at issue herein are created and governed by the unambiguous SUA.   The SUA clearly allows for the construction and operation of a well on the property at issue.   Accordingly, Chesapeake is entitled to judgment on the first three counts and count five in the amended complaint, all of which are dependent upon a finding that no surface rights exist.

### 2.  Count Four of the Complaint

The Court next addresses count four – Plaintiffs' claim that they were fraudulently induced into signing the SUA.   Under Ohio law, to prove fraudulent inducement, a plaintiff must establish "(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (quoting *Lepera v. Fuson*, 613 N.E.2d 1060, 1063 (Ohio Ct.App. 1992)).

In their amended complaint, Plaintiffs allege as follows with respect to this claim:

In June 2011, Defendant Chesapeake, by and through its authorized agent, Matt Mroczkowski, falsely represented to the Coniglios that Defendant Chesapeake had the right to conduct surface operations, including constructing well-pads, access roads and drilling, on the Real Estate and that the Real Estate was not subject to a lease addendum that prohibited surface operations on the Real Estate. Defendants Chesapeake and Mroczkowski fraudulently concealed from the Coniglio's that the Lease covering the Real Estate did contain an addendum that prohibited Defendant Chesapeake from conducting surface operations including constructing well-pads, access roads and drilling on the Real Estate.

>Defendant Chesapeake's representations that it had the right to conduct surface
>operations, including constructing well-pads, access roads and drilling on the Real
>Estate and that the Real Estate was not subject to a lease addendum that prohibited
>surface operations on the Real Estate were false.

Doc. 29 at 17. The shortcoming of this claim lies in the fact that there is no evidence to support these allegations.   Moreover, the evidence that has been produced directly defeats any claim of fraudulent inducement.

There is no dispute that Matt Mroczkowski approached Plaintiffs and indicated that Chesapeake desired to drill an oil and gas well on the parcel covered by the Lease, addendum, and SUA.   Plaintiffs contend that they could not remember whether this parcel was one of the three parcels for which they had negotiated non-drilling leases. When they inquired about whether the Lease had an addendum:   "Mr. Mroczkowski responded that he had a copy of the lease covering the parcel upon which the well-pad and access road would be located, but he was not aware of any addendum to that lease."   Doc. 72-1 at 4 (Joseph Coniglio affidavit).   There exists no evidence in the record to suggest that this statement was false.   The fact that one employee for Chesapeake may not have been aware of the addendum does not strike the Court as beyond the realm of possibilities.   However, more important to the Court's analysis, Plaintiffs *negotiated and signed* the addendum.   They cannot now claim to be "unsure" of its existence or contents.   As a matter of law, knowledge of the very document they signed must, at a minimum, be imputed to them.   As such, even if some tortured interpretation could find the above statement to be false, there could be no reasonable reliance on such a statement.

Furthermore, Plaintiffs' claim is untenable to the extent it relies upon claims that Chesapeake falsely represented that it had the right to engage in surface operations when no such rights existed.   Again, even if these representations were true – a fact that the Court finds highly dubious given that Chesapeake sought to negotiate the SUA *at this same time* – once more,

Plaintiffs did not rely on these statements.   Instead, they sent the proposed SUA to their counsel, Attorney Alan Wenger.   It is undisputed that Wenger was in possession of the full Lease and addendum prior to advising his clients, Plaintiffs, to execute the SUA.   As Wenger was acting as Plaintiffs' agent, his knowledge is likewise imputed to them.   Accordingly, the full documentation of the parties' prior dealings was known to Plaintiffs and their counsel prior to executing the SUA.   As such, any alleged false representations about the contents of those documents could not have been reasonably relied upon by Plaintiffs in executing the SUA. Judgment in favor of Chesapeake on this claim is required.

The Court would note that consideration of Plaintiffs' experts, Attorney Wenger and former-Justice Douglas, would not alter the Court's conclusion.   The Court also finds that much, if not all, of the motion to strike these affidavits is proper.   Even a cursory review of the affidavits reveals that they are replete with "opinions" on the legal interpretation of the contract.   Even if such an opinion were proper on the ultimate issue herein, the Court has found that the contracts are unambiguous and therefore consideration of these opinions would be improper.   For purposes of having a complete record, the Court GRANTS the motion to strike both affidavits.

Similarly, the affidavit of land agent James Snyder does nothing to alter the Court's analysis.   Snyder does nothing other than to offer his opinion about the intent and meaning of the initial Lease and addendum.   As Snyder was not involved in any fashion with negotiating or even reviewing the SUA, a document this Court has found critical to determining the parties' rights, his affidavit does not affect the Court's analysis.

### 3.  Count Six of the Complaint

In count six of the complaint, Plaintiffs allege a count of conversion, asserting that Chesapeake removed soil from their property and utilized it to build an access road on a

neighboring property.   In seeking summary judgment, Chesapeake relies upon a letter written by Plaintiffs' counsel that states "that you are correct that Chesapeake did move the dirt back into the location but only after requested to do so by the Coniglios."   Chesapeake claims that this statement defeats any claim for conversion because it undermines any argument that Plaintiffs were injured.   The Court agrees with Plaintiffs that the evidence relied upon by Chesapeake is improper to consider at the summary judgment stage.   While Plaintiffs raise an overbroad argument that no unsworn letter could ever be used in support of summary judgment, the core of their argument is correct.   There is no affidavit of counsel to authenticate the letter from counsel, and the Court therefore will not consider it.

Moreover, even if the Court were to consider the letter, the record would be left with facts that are disputed.   During his deposition, Joseph Coniglio clearly stated that not all of the dirt removed from Plaintiffs' property had been returned by Chesapeake.   As such, the Court cannot grant summary judgment on the conversion claim.

The Court would also note that Chesapeake's claim that the conversion claim must fail because no damages can be shown also lacks merit.   Crediting Joseph Coniglio's testimony that not all of the dirt has been returning leads directly to the conclusion that damage has been suffered. Accordingly, the conversion claims survives summary judgment.

### 4.  Count One of the Counterclaim

Chesapeake has also sought summary judgment on count one in its counterclaim, while Plaintiffs have similarly sought judgment on this claim.   In that regard, the Court would note that it has previously resolved the precise claim raised by Chesapeake regarding the preferential right to renew clause in the lease.   This Court resolved that issue in Chesapeake's favor.   However, Plaintiffs contend that this issue was raised between them and Chesapeake in previously-filed state

litigation.  In fact, since the briefing of this matter, the state court has resolved the issue and entered a final judgment.  Given those facts, the Court will perpetually stay ruling on this claim until all state court appeals have been resolved.[2]

**5.  Count Two of the Counterclaim**

Plaintiffs also seek to dismiss count two of Chesapeake's counterclaim.  In count two, Chesapeake asserts a breach of contract claim, asserting that its right to commence operations on the land has been interfered with by Plaintiffs' actions.  Plaintiffs' motion is premised upon its assertions regarding the meaning of the Lease, addendum, and the SUA.  Having rejected those arguments, it follows that Plaintiffs' motion on this count in the counterclaim must be denied.  Moreover, Plaintiffs' improperly attempt to limit the scope of count two to the time frame regarding the now-dissolved temporary restraining order.  As pled, Chesapeake's breach of contract claim extends to all of the actions that they claim deprived them of the ability to develop Plaintiffs' land under the SUA.  Nothing in that claim temporally limits the claim to the time the TRO was in place.  As such, the motion to dismiss count two of the counterclaim is not well taken.

**6.  Count Three of the Counterclaim**

With respect to count three in the counterclaim, a claim for unjust enrichment, the Court agrees with Chesapeake's initial argument that it may properly plead such a claim in the alternative, especially given that Plaintiffs were claiming that the SUA was invalid.  However, having found the SUA, Lease, and addendum to be valid and unambiguous, it follows that Chesapeake may not now pursue the quantum meruit claim.  *See Wells Fargo Fin. Leasing Inc. v. Gilliland*, 2013 WL 872408, at *4 (Ohio Ct. App. May 22, 2006) (holding that when a party is

---

2 At this time, the Court will not dismiss the claim pursuant to the *Colorado River* abstention doctrine.  The Court agrees that Plaintiffs may not initiate a second suit surrounding the same subject matter and then attempt to shield themselves from counterclaims via the abstention doctrine.

liable under an express contract, claims for unjust enrichment are rendered moot).   As this claim

is now moot, it is dismissed.

### 7.   Counts Four and Five of the Counterclaim

Plaintiffs next seek dismissal of Chesapeake's claims for abuse of process and malicious

prosecution.   With respect to malicious prosecution, the Court agrees with Plaintiffs.

> [A] plaintiff who brings a malicious civil prosecution suit must show that the
> previous litigation terminated in his or her favor. For that reason, a claim for
> malicious civil prosecution cannot be brought as a counterclaim, but must be
> brought in a separate suit after the underlying litigation is terminated.

*Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294, 299 n.4 (1994).   In an

attempt to avoid dismissal, Chesapeake relies upon *Dever v. Lucas*, 174 Ohio App.3d 725, 729

(Ohio Ct. App. 2008).   In *Dever*, the intermediate Ohio appellate court adopted a broad definition

of "prior proceeding" and concluded that the filing of petitions in a bankruptcy court were prior

proceedings for the purposes of pursuing malicious prosecution.   Even if this Court were to find

such reasoning persuasive, the binding holding of the Ohio Supreme Court in *Yaklevich* would still

apply.   Malicious prosecution *cannot* be brought as a counterclaim.   The Court declines to carve

out some exception to this rule that would apply when injunctive relief is sought by the complaint.

Accordingly, the malicious prosecution claim is premature and dismissed without prejudice.

Under Ohio law, "the three elements of the tort of abuse of process are: (1) that a legal

proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding

has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and

(3) that direct damage has resulted from the wrongful use of process."   *Yaklevich*, 68 Ohio St.3d at

298 (footnotes omitted).   In essence, Chesapeake's counterclaim for abuse of process alleges that

Plaintiffs deliberately named the wrong party when suit was initiated.   As will be explained in

response to Chesapeake's motion for costs, the Court agrees.   However, based upon a review of

Ohio law, the Court can find no authority that would suggest those actions give rise to an abuse of process claim.  Plaintiffs did not attempt to pervert the legal process to obtain an otherwise unobtainable result.  Rather, they sought wholly permissible relief, albeit in the absence of the real party in interest.  Under those facts, the Court declines to recognize an abuse of process claim.

### 8.  Count Six of the Counterclaim

Finally, the Court finds that Chesapeake's final counterclaim, "equitable tolling," cannot stand on its own.   As Chesapeake implicitly recognizes in its response, this is an equitable *remedy* available to the Court, and certainly will remain so as Chesapeake's breach of contract remains pending.  Once again, however, the Court has found no Ohio law that would suggest that this remedy is some form of free-standing claim.   Accordingly, dismissal of this "claim" is appropriate, with the recognition that such a theory may still be pursued as a remedy to the alleged breach of contract.[3]

### 9.  Request for Fees and Costs

A court may sanction an attorney under § 1927 for conduct that "so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927; *see also Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 395–96 (6th Cir. 2009). Section 1927 sanctions are appropriate when counsel "objectively falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party. The purpose is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Red Carpet Studios Div. of Source Advantage, Ltd.*, 465 F.3d at 646 (citation and internal quotation marks omitted). An award of fees under § 1927 requires a showing of more than

---

3 Having resolved the motion for summary judgment on these counterclaims, the motion to dismiss (Doc. 31) is deemed moot.

negligence or incompetence but less than subjective bad faith. *Hall*, 595 F.3d at 276; *see also*

*Dixon v. Clem*, 492 F.3d 665, 679 (6th Cir. 2007).

In *Wilson-Simmons v. Lake County Sheriff's Department*, 207 F.3d 818, 824 (6th Cir.

2000), the Sixth Circuit further explained:

> An attorney's ethical obligation of zealous advocacy on behalf of his or her client
> does not amount to *carte blanche* to burden the federal courts by pursuing claims
> that are frivolous on the merits . . . . Accordingly . . . when an attorney knows *or*
> *reasonably should know* that a claim pursued is frivolous, or that his or her
> litigation tactics will needlessly obstruct the litigation of nonfrivolous claims, a
> trial court does not err by assessing fees attributable to such actions against the
> attorney.

*Id.* (emphasis in original) (citations omitted) (internal quotation marks omitted).   More recently,

the Sixth Circuit has stated that sanctions are appropriate under § 1927 when an attorney

"intentionally abuses the judicial process or knowingly disregards the risk that his actions will

needlessly multiply proceedings."   *Red Carpet Studios*, 465 F.3d at 646.

In their motion for fees and costs, Chesapeake contends that sanctions are appropriate for

Plaintiffs' counsel's failure to name Chesapeake initially in this matter and their subsequent

opposition to Chesapeake's intervention.   Based upon the analysis set forth below, the Court

agrees.

It is undisputed that Plaintiffs and Chesapeake are involved in earlier-filed state court

litigation in Carroll County Common Pleas Court.   In fact, that litigation involves the same Lease

involved herein and was filed nearly four months before the complaint was filed in this matter.   It

is further undisputed that Plaintiffs, through their current counsel, had been engaged with disputes

with Chesapeake regarding installation of the pipeline since at least August of 2011.   Included in

this correspondence was an in-person meeting between Plaintiffs, their current counsel, a

Chesapeake executive, and Chesapeake in-house counsel in March of 2012.   Still later, in June of

2012, Chesapeake notified Plaintiffs that it believed it had the right to install a pipeline on the property in question herein.

The following correspondence has been made a part of the record before this Court.   On June 21, 2012, Plaintiffs' counsel informed a representative of Utica Gas Services that no one would be permitted on the property to construct anything until the state court litigation had been completed.   Counsel for *Chesapeake* responded to that letter on June 25, 2012.   Within that response, Chesapeake identified itself as "the lessee by assignment of the oil and gas lease" at issue herein.   That letter continued as follows:   "Chesapeake will continue to exercise its rights under the Lease and the Surface Use Agreement, including accessing the leased property for construction of the pipeline via its authorized agents."   Doc. 42-2 at 29.   Plaintiffs' counsel responded two days later in a letter to counsel for Chesapeake, and Chesapeake responded to that letter on June 29, 2012, another two days later.   Plaintiffs' counsel responded later that same day to the June 29, 2012 letter.   Finally, Plaintiffs' counsel and Chesapeake's counsel exchanged emails on June 29, 2012.

Despite this lengthy history of correspondence between *Chesapeake* and Plaintiffs, Plaintiffs initiated this litigation against solely the contractor that appeared on their property, CBC Services, Inc. and its owner.   In opposing the instant motion for fees and costs, Plaintiffs' counsel appear to feign ignorance over the proper party to seek injunctive relief against, contending that it was only CBC that they were certain was trespassing on their property at the time suit was filed. At best, this response could be viewed as disingenuous.   In contrast, at worst, it could be viewed as deliberately false.   It is difficult to conceive that Plaintiffs' counsel could 1) engage in sending letter after letter back and forth with Chesapeake in the last week of June, 2) be notified that Chesapeake fully intended to utilize its contractual rights to build a pipeline using its authorized

agents, and 3) still claim that it was unaware that Chesapeake was the real-party-in-interest in this suit.

Furthermore, any such claim that it was proper to sue only CBC is belied by Plaintiffs' counsel's own argument in opposing the motion for costs:  "At the heart of this matter is the interpretation of the language contained in Plaintiffs' leases and addendum." Doc. 58 at 22.   It is clear beyond all doubt that Chesapeake was the lessee by assignment of the Lease and addendum at issue herein.   Additionally, counsel's actions in the state court made it clear that it sought not only to enjoin CBC, but also "their principals, agents, contractors, designees, and/or others acting in participation and/or concert with any one of them."   In other words, counsel sought to enjoin Chesapeake from exercising its contractual rights after making the deliberate decision to **not** name Chesapeake as a defendant.

Chesapeake posits several arguments on *why* Plaintiffs' counsel may have chosen not to name Chesapeake as a defendant, including that the state court judge routinely recused himself from matters involving Chesapeake.   However, this Court need not assign a motive to counsel's actions.   Rather, the Court must simply determine whether counsel objectively fell short of the obligations owed by a member of the bar to the court and caused additional expense to the opposing party. Once again, one of the purposes of a § 1927 sanction is to punish aggressive tactics that far exceed zealous advocacy.   Herein, the Court finds no barrier to concluding that counsel fell well short of their obligations owed as members of the bar.

However, while this Court need not opine on the motive for counsel's actions, a review of those actions provides background for the Court's conclusions.   Counsel filed this suit in state court on July 9, 2012.   The matter was assigned to Judge Olivito – the same judge that had recused from the then-pending first suit filed by counsel and the Coniglios – a lawsuit that was premised

upon the **exact same lease** at issue herein.   In what appears to this Court to be a clear effort to once again avoid recusal, counsel made effort to minimize the use of Chesapeake's name.   For that matter, it was the state court judge that prompted counsel to provide more detailed information during the TRO hearing.   It was only at that time that counsel ever mentioned Chesapeake's lease rights.   Counsel then described the correspondence detailed above that lasted for the final week of June of 2012, but did not provide any of that correspondence to the state court judge.   Finally, counsel noted that "we're not aware of any basis by which Chesapeake would have an opportunity to intervene here."   It is more than telling that counsel did not file the lease, addendum, and SUA with the complaint, nor present them during the TRO hearing.

Furthermore, Plaintiffs' counsel may not seek protection by virtue of its claim that it notified both CBC and Chesapeake about the pending TRO before its issuance.   In that regard, Plaintiffs' counsel appear to take the position that Chesapeake had more than ample opportunity to appear and address the issue by virtue of being told of the pending motion on the day it was filed. This fact, of course, ignores that Chesapeake was an unnamed party at that time, so it is difficult to conceive of how out-of-state counsel could have somehow prepared and filed the documents that would be necessary to facilitate an appearance and allow for argument.   Instead, it simply makes clear that counsel chose a mechanism for enjoining Chesapeake that virtually ensured that no meaningful opposition could occur.

In response, counsel time and again relies upon so-called "expert" opinions from other attorneys and a former Ohio Supreme Court justice.   Once again, however, none of these opinions appear to review the actual facts herein.   They focus time and again on the reasonableness of suing CBC, concluding that counsel was *ethically obligated* to bring suit to protect Plaintiffs.   In so doing, those opinions **wholly ignore** whether it was objectively reasonable to deliberately

*exclude* Chesapeake from the lawsuit and require Chesapeake to seek to intervene.   Moreover, these opinions fail to opine on the impropriety of seeking injunctive relief against CBC without a single mention in the body of the complaint of the Lease, addendum, and the SUA.

In essence, this Court must answer only one question to determine sanctions are appropriate:  May counsel ignore the months of ongoing correspondence with Chesapeake that displayed the parties' differing view over surface rights and seek an injunction with full knowledge that it will directly impact Chesapeake *without* naming Chesapeake as a defendant? The answer is a resounding "no."  It is precisely this type of gamesmanship that needlessly multiples proceedings.   Within weeks of filing suit, counsel was notified that **Chesapeake** would be exercising its rights through one of its authorized agents.   Thereafter, nothing changed prior to the suit counsel initiated.   Accordingly, it was wholly unreasonable to conclude that CBC and its employees were the sole proper parties in interest.

Moreover, the Court also rejects the argument raised by counsel that it did not name Chesapeake under some belief that Chesapeake had assigned away any of its rights to construct the pipeline.  First, there is no factual basis for this belief.   At best, counsel knew that Chesapeake had made partial assignments of the Lease and related documents.   No document was ever produced to suggest that Chesapeake had fully assigned *any* portion of those documents. Moreover, it is once again more than a bit disingenuous to claim that such an assignment removed Chesapeake as a proper party when counsel made every effort to make not a single mention of those documents in the complaint that was filed.[4]

Based upon the above, the Court finds that Plaintiffs' counsel unreasonably and vexatiously multiplied the proceedings.   Within fourteen (14) days of this order, Chesapeake shall

---

4 For that matter, if counsel truly believed that some full assignment had occurred, and had a reasonable **factual** basis for that conclusion, it begs the question of why none of the alleged assignees were named when suit was filed.

file a memorandum detailing the costs it incurred in seeking to dissolve the TRO and in seeking to intervene in this matter.   Within fourteen (14) days of that filing, Plaintiffs' counsel may file any opposition to the *amount* of the fees requested.   However, counsel shall not reiterate their claims that an award is improper.   The Court has now determined that such an award is proper.

IT IS SO ORDERED.


July 16, 2013                              /s/ John  R  Adams
                                           JUDGE JOHN R. ADAMS
                                           UNITED STATES DISTRICT JUDGE